IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL L. LEIGHTON and :
NANCY A. LEIGHTON :
    Plaintiffs :
: CIVIL NO. 1:13-CV-2018
  v. :
: (Judge Caldwell)
CHESAPEAKE APPALACHIA, :
LLC, et al. :
    Defendants :

*M E M O R A N D U M*

I. *Introduction*

    Plaintiffs, Michael L. Leighton and Nancy A. Leighton, filed this suit in state court, seeking damages and declaratory relief arising from Defendants' natural-gas drilling operations near Plaintiffs' property, operations commonly known as "fracking." Defendants removed the case here on the basis of diversity jurisdiction. Defendants are Chesapeake Appalachia, LLC ("Chesapeake Appalachia"); Chesapeake Energy Corporation ("Chesapeake Energy"); Nomac Drilling, LLC; and Schlumberger Technology Corporation.[1]

    Plaintiffs leased their land to Chesapeake Appalachia for the purpose of extracting the natural gas, and the Lease has an arbitration clause. We are considering Defendants' motion to compel arbitration and to stay the case while the arbitration proceeds. One of the issues presented is whether defendants, Chesapeake Energy,

---

[1] Defendants say that Plaintiffs incorrectly identified Schlumberger Technology Corporation as "Schlumberger Technology Corporation d/b/a/ Schlumberger Well Services." (Defs.' Mot. n.2).

Nomac, and Schlumberger, as nonsignatories to the Lease, can require the signatory plaintiffs to arbitrate the claims they have against these defendants.

II. *Standard of Review*

The parties rely on different standards of review in arguing the merits of the motion to compel. Defendants contend they can establish their right to arbitrate Plaintiffs' claims by the allegations of the complaint and the provisions of the Lease. They therefore bring their motion to compel under Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) deals with the legal sufficiency of the complaint by focusing on its factual allegations and, as relevant here, examining the Lease, because Plaintiffs' complaint contains a breach-of-contract claim based on that document. *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 772 (3d Cir. 2013)(on a Rule 12(b)(6) motion, the court looks at the complaint and authentic documents if the claims are based on those documents). On the other hand, Plaintiffs maintain the motion should be evaluated under Fed. R. Civ. P. 56, which deals with motions for summary judgment and allows consideration of evidence that goes beyond the pleadings and supporting documents. *Id.* (citing Rule 56(c)).

*Guidotti* tells us how to proceed. First, if the defendants can satisfy the Rule 12(b)(6) standard, then the parties should be sent to arbitration without further proceedings. *Guidotti*, 716 F.3d at 773-74. However, "if the complaint and its supporting documents are unclear regarding the agreement to arbitrate," *id.* at 776, the motion to compel must be denied pending development of a factual record. *Id.* at 774. Similarly, even if "the complaint and incorporated documents facially establish arbitrability," *id.*, if

the plaintiff, in opposing the motion, presents evidence "sufficient to place the agreement to arbitrate in issue," *id.* at 776, the motion to compel should not be granted. *Id.* at 774. At that point, the parties are entitled to discovery on the question of arbitrability, *id.* at 776, and the issue should be decided under the Rule 56 summary-judgment standard, not the motion-to-dismiss standard. *Id.* at 774.

We thus start with the standard of review for a Rule 12(b)(6) motion. Under Rule 12(b)(6), "[w]e 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Byers v. Intuit, Inc.*, 600 F.3d 286, 291 (3d Cir. 2010)(quoted case omitted). As noted, this inquiry also includes examining the Lease because Plaintiffs base their breach-of-contract claim on the Lease.

With this standard in mind, we set forth the background to this litigation, as Plaintiffs allege it.

III. *Background*

Plaintiffs are the owners of real property located in Granville Summit, Bradford County, Pennsylvania (the "Property"). (Compl. ¶ 2). On August 15, 2008, they entered into an "Oil & Gas Lease" with defendant Chesapeake Appalachia so that Chesapeake Appalachia could "obtain the legal right to drill on or near Plaintiffs' Property and extract natural gas from Plaintiffs' Property." *(Id.)*.

The Lease was for a five-year term, beginning on August 15, 2008. (Doc. 19-1, ECF p. 3, Lease, Ex. A to Defs.' Motion). It contained the following pertinent

provisions. (Each plaintiff is the "Lessor" and Chesapeake Appalachia is the "Lessee.")

First, the Lease allowed Chesapeake Appalachia to search and drill for natural gas on

Plaintiff's Property:

> Leasing Clause. Lessor hereby leases exclusively to Lessee all the oil and gas . . . underlying the land herein leased, together with such exclusive rights as may be necessary or convenient for Lessor, at its election, to explore for, develop, produce, measure, and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests; to drill, maintain, operate, plug, abandon, and remove wells; . . .

(*Id.*). An Addendum to the Lease required Chesapeake Appalachia to correct any

damage to Plaintiffs' water supply. The Addendum's "Water Damage Clause" provided

as follows:

> In the event any activity carried on by Lessee pursuant to the terms of this lease damages, disturbs, or injures Lessor's potable water well or source located on these leased premises, Lessee shall at its sole cost and expense use its best efforts to correct any such damage, disturbance or injury.

(*Id.*, ECF p. 6).

Finally, the Lease contained an arbitration clause, providing:

> Arbitration. In the event of a disagreement between Lessor and Lessee concerning this Lease, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

(*Id.*, ECF p. 4).

Plaintiffs allege that Chesapeake Appalachia and Nomac are "wholly owned and operated subsidiaries and/or divisions of Defendant Chesapeake Energy." (Compl. ¶ 14). Defendant Schlumberger is a Texas corporation. (*Id.* ¶ 22). Chesapeake Appalachia, Nomac and Chesapeake Energy engage in "fracking" or "hydraulic fracking" activity, which includes drilling, building and operating wells, and producing, processing and transporting natural gas. (*Id.* ¶ 18). Schlumberger engages "in the business of providing an array of fracking-related natural gas well services to oil and gas drillers across the United States," including Chesapeake Appalachia, Nomac and Chesapeake Energy. (*Id.* ¶ 25).

Chesapeake Appalachia owned two wells, the Morse 3H Gas Well, and the Morse 5H Gas Well, (*id.* ¶ 16), which were "in close proximity" to the Property, (*id.* ¶ 48), located about one-half mile from Plaintiffs' residence and water supply well. (*Id.* ¶ 35). Chesapeake Appalachia and Chesapeake Energy owned, designed, constructed and operated the wells. (*Id.* ¶¶ 36 and 37). Nomac "carried out fracking related drilling, cementing, perforating, squeezing and other well servicing activities at the Wells." (*Id.* ¶ 38). Schlumberger "carried out drilling, cementing, perforating, squeezing and other fracking-related well servicing activities at the Wells." (*Id.* ¶ 39).

In or about July 2010, Defendants[2] began constructing the wells and continued their construction through November 2011. (Id. ¶¶ 42 and 49). In November 2011, Defendants, either individually or jointly, "conducted remedial perforations and

---

[2] "Defendants" refers to all four defendants. (Compl. ¶ 29).

cement squeeze operations" on the Morse 5H well.  (*Id.* ¶ 50).  In May 2012, Defendants, either individually or jointly, were performing remedial activities at the Morse 5H well when "squeeze perforations . . . were exposed to formation pressures, allowing contaminants . . . to escape from the well bore for as many as 7 days."  (*Id.* ¶ 51).  The remedial activities were required because Defendants had negligently constructed the wells.  (*Id.* ¶ 52).  The construction violated industry standards.  (*Id.* ¶ 53).

Before the gas wells were drilled, "on or about May 25, 2011, defendant Chesapeake Appalachia conducted pre-drill sampling of Plaintiffs' water supply."  (*Id.* ¶ 46).  The sampling showed Plaintiffs' water supply to be of good quality. (*Id.* ¶ 47).  In May 2012, following the escape of contaminants, the Pennsylvania Department of Environmental Protection and Chesapeake Appalachia took groundwater samples from the Property.  (*Id.* ¶¶ 54 and 58).  The samples showed substantial increases in the levels of methane, ethane, propane, iron, and manganese.  (*Id.* ¶¶ 57-63).  The groundwater located at the Property had also "drastically changed in clarity and color, it had a foul odor and contained noticeable levels of natural gas."  (*Id.* ¶ 55).  Additionally, "[w]ater drawn from Plaintiffs' groundwater supplies had also become flammable and surface water running through the creek on [the] Property had begun bubbling."  *Id.*[3]

---

[3] Chesapeake Appalachia attempted some remedial measures.  In or about June 2012, it installed a temporary water treatment system that made the water safe for residential uses, "but not for drinking."  (*Id.* ¶ 67).  In or about June 2012, it installed a "sub-slab air insertion system into Plaintiffs' basement to keep the natural gas from infiltrating Plaintiffs' Property at dangerous and explosive levels."  (*Id.* ¶ 68).

The complaint presents eight causes of action. In the first seven, all Defendants are named. The first cause of action alleges Defendants violated the Pennsylvania Hazardous Sites Cleanup Act (HSCA), 35 Pa. Stat. Ann. § 6020.101 *et seq.*, by "caus[ing] the spill, release and/or discharge of 'hazardous substances'" as defined in the HSCA. (Compl. ¶ 78). The second cause of action alleges negligence in the manner in which Defendants drilled, owned, and operated the wells. The third cause of action alleges negligence per se because Defendants violated several Pennsylvania statutes and regulations applicable to their activity. The fourth cause of action alleges private nuisance. The fifth cause of action alleges strict liability for abnormally dangerous and ultra-hazardous activities. The sixth cause of action alleges trespass. The seventh cause of action alleges a claim for "inconvenience and discomfort."

The eighth cause of action is for breach of contract and names only Chesapeake Appalachia. Plaintiffs allege Chesapeake Appalachia breached the Lease in the following ways: (1) it failed to drill, construct and install the wells to minimize effects on the Property; (2) it failed to restore the Property and water supply to their pre-drilling condition; and (3) it failed to conduct its operations in accordance with the laws of Pennsylvania and regulations promulgated by the Pennsylvania Department of Environmental Protection.

In their prayer for relief, Plaintiffs seek damages in the form of the costs of remediating the Property, other compensatory damages, punitive damages, and an injunction requiring Defendants to stop the activity that was contaminating the Property.

IV. *Discussion*

    A. *The Scope of the Arbitration Clause Covers Plaintiffs' Claims*

Under either federal or state law, arbitration will be required if: (1) there is a valid agreement to arbitrate; and (2) the dispute comes within the scope of the agreement. *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009); *Pisano v. Extendicare Homes, Inc.*, ___ A.3d ___, ___, 2013 WL 4046673, at *2 (Pa. Super. Ct. 2013).[4]

Plaintiffs do not argue there is no agreement to arbitrate (at least as to Chesapeake Appalachia, a signatory to the Lease) but do dispute that their claims come within the scope of the agreement.

Defendants argue that the arbitration clause covers the Plaintiff's claims because it is expansive, requiring arbitration of disputes "concerning this Lease," "performance" under the Lease, or "damages caused by Lessee's operations." Defendants argue that Plaintiffs' claims fall within these provisions since all of them arise from Chesapeake Appalachia's operations authorized by the Lease. As further support, they note that under federal and state law, courts will find that a dispute comes within the scope of an arbitration clause "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."

---

[4] Defendants assert that no decision has to be made about whether the Federal Arbitration Act, 9 U.S.C. §§ 1-16, or state arbitration law controls because the law is the same. Plaintiffs cite both federal and state cases. In these circumstances, we also make no decision as to which law controls.

-8-

*Century Indem. Co. v. Certain Underwriters at Lloyds*, 584 F.3d 513, 524 (3d Cir. 2009)(quoted Supreme Court case omitted). *See also Callan v. Oxford Land Dev., Inc.*, 858 A.2d 1229, 1233 (Pa. Super. Ct. 2004).

We agree with Defendants that Plaintiffs' claims are within the scope of the arbitration agreement. As they assert, the clause covers disagreements broadly worded to include disagreements about performance under the Lease and Chesapeake Appalachia's operations. See *Roman v. Chesapeake Appalachia, LLC*, No. 11-CV-1614, 2012 WL 2076846, at *4 (M.D. Pa. June 28, 2012)(observing that the same arbitration clause was broadly written, although dealing with a different type of claim). We add that the clause requires arbitration of "all such disputes." Since Plaintiffs' claims are based on Defendants' drilling activities, they come within the scope of the arbitration clause, as either disputing Defendants' performance or damages resulting from their operations.

In reaching this conclusion, we recognize that Plaintiffs rely on language in Pennsylvania cases saying that "arbitration agreements are to be strictly construed and such agreements should not be extended by implication." *Pisano*, *supra*, 2013 WL 4046673, at *9. The Pennsylvania Superior Court has acknowledged that this language is in "tension" with the language we quoted above, that a dispute should be construed as being covered by the arbitration agreement unless it can be "said with positive assurance" that it is not. The superior court said the solution is to look to state law on contract construction and to interpret the clause to give effect to the parties' intent as manifested by the contractual language. *Callan*, *supra*, 858 A.2d at 1233. Here, the

contractual language establishes that Plaintiffs' claims are covered by the arbitration clause. *Cf. Callan*, 858 A.2d at 1233 (in sending a case to arbitration, noting that "'all' contract disputes does mean 'all' contract disputes").

The result is the same under federal law. "The FAA instructs courts to refer to principles of applicable state law when determining the existence and scope of an agreement to arbitrate." *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). "Under Pennsylvania law . . . the scope of [an] arbitration [agreement] 'is determined by the intention of the parties as ascertained in accordance with the rules governing contracts generally.'" *State Farm Mut. Auto. Ins. Co. v. Coviello*, 233 F.3d 710, 716 (3d Cir. 2000)(quoted case omitted).

Plaintiffs make the following arguments that their claims are not within the scope of the arbitration clause. First, they argue that the Lease "is simply an instrument that created an agreement between the Plaintiff and defendant Chesapeake Appalachia and outlined responsibilities of each party to the other," (Doc. 20, ECF p. 7, Pls.' Opp'n Brief), while their claims "fall well outside the parameters of the Lease" and are "extraneous" to it. (Id.). This argument fails because it just says in another way that the Lease is a contract, but without acknowledging that it contains an arbitration clause which also governs the relationship between the parties.

Second, Plaintiffs argue that the arbitration agreement is inapplicable because the damages did not arise from activities performed on the Property. Instead, the damages arose from wells on land in close proximity to the Property, but not on it.

-10-

They principally rely on *Armstrong v. Chesapeake Appalachia, LLC*, No. 10-CV-0681, (Pa. Common Pleas Ct. – Bradford Cnty. June 27, 2012)(unpublished disposition), in support.[5]

In *Armstrong*, as here, the plaintiffs were suing Chesapeake Appalachia for damage to their property from the defendant's natural-gas drilling operations on land adjoining the property. Chesapeake Appalachia moved to compel arbitration based on a clause materially identical to the one in the instant case. Denying the motion, the court said that the lease was intended to apply only "to operations involving a gas well drilling on [the plaintiff's] property." (Doc. 21-1, ECF p. 4).

*Armstrong* is distinguishable. The plaintiffs there brought only tort claims. Here, in contrast, Plaintiffs have, in addition to tort claims, sued for breach of the Lease. In doing so, they have alleged that their Property and water supply were damaged by Defendants' operations on nearby land. Thus Plaintiffs have themselves alleged that the Lease applies to activities on adjoining land.[6]

Again relying on *Armstrong*, Plaintiffs argue the arbitration clause does not apply to their claims because the clause was intended to apply to disagreements between the parties in their capacities as lessor and lessee. As the court in *Armstrong* reasoned:

---

[5] *Armstrong* is attached to Plaintiffs' opposition brief as Ex. A.

[6] This position is supported by the language of the Lease itself which gives Chesapeake Appalachia the right, among other things, to "explore, develop, produce, measure, and market production from the [Property], *and from adjoining lands*." (Doc. 19-1, ECF p. 3)(emphasis added).

-11-

> [T]he arbitration clause, which identifies the principals as
> "Lessor" and "Lessee", was intended by the parties to govern
> disagreements which arise between them qua lessor and
> lessee. That is not the case here. All of Plaintiffs' claims,
> sounding in trespass, would be viable in the absence of a
> lease. The lease is wholly incidental to the alleged causes of
> action.

(Doc. 21-1, ECF P. p. 4). We disagree with this reasoning. The court does not explain why the tort claims are not disagreements that have arisen between the parties in their capacities as lessor and lessee. The court is essentially saying that the arbitration clause cannot cover tort claims. But an arbitration clause can cover such claims. *See Roman*, *supra*, 2012 WL 2076846, at *4; *Callan*, *supra*, 858 A.2d at 1233.

Having decided that the claims come within the scope of the arbitration clause, we turn to the parties' arguments on whether Defendants can enforce the clause against Plaintiffs.

### B. *Enforceability of the Arbitration Clause*

All the defendants move to compel Plaintiffs to arbitrate their claims even though only Chesapeake Appalachia is a signatory to the Lease. The nonsignatory defendants, Chesapeake Energy, Nomac, and Schlumberger, assert they can require Plaintiffs to arbitrate based on theories of agency and equitable estoppel.

Before we get to Defendants' arguments, however, we will address Plaintiffs' position that none of Defendants can insist on arbitration, even Chesapeake Appalachia, because "arbitration clauses are not enforced 'when, as here, a plaintiff also has claims arising from the same set of facts against several defendants who are not

-12-

bound by an arbitration agreement,'" (Doc. 20, ECF p. 10, Pls.' Opp'n Br.). This is a quotation from the undersigned's opinion in *Scott v. LTS Builders LLC*, No. 10-CV-0581, 2011 WL 6294490, at *5 (M.D. Pa. Dec. 5, 2011)(Caldwell, J.). If *Scott* applies here, we need not address Defendants' reliance on agency or equitable estoppel. We can deny the motion to arbitrate, even as to the signatory Chesapeake Appalachia.

*Scott* does not apply here. In *Scott*, we denied a motion to compel arbitration, but the facts were materially different. Only one defendant, the signatory to the arbitration agreement, sought arbitration, and there were ten other defendants, with five of those insisting that the claims against them be resolved in court. 2011 WL 6294490, at *5. Relying on *School District of Philadelphia v. Livingston–Rosenwinkel, P.C.,* 690 A.2d 1321 (Pa. Commw. Ct. 1997), we ruled that sending the case against the signatory to arbitration would not satisfy Pennsylvania's public policy of enforcing arbitration agreements "as a means of promoting swift and orderly disposition of claims" *Id.* (quoting *Livingston–Rosenwinkel*, 690 A.2d at 1322-23). As that case noted, it would result in litigating the same claims twice and in a "'protracted, piecemeal disposition of the dispute.'" *Id.* (quoting *Livingston–Rosenwinkel*, 690 A.2d at 1323). Here, on the other hand, all Defendants are moving for arbitration, so a public policy against duplicative and piecemeal disposition of disputes is not implicated.

We thus turn to Defendants' arguments for arbitration.

1. *Agency-Type Relationship*

It is apparent that Chesapeake Appalachia as a signatory to the arbitration agreement can enforce it against Plaintiffs. Defendants argue that the nonsignatories to the arbitration agreement can also enforce it because Plaintiffs allege the nonsignatory defendants were the agents of Chesapeake Appalachia, carrying out the latter's obligations under the Lease. Defendants cite in support *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110 (3d Cir. 1993); *Amato v. KPMG LLP*, 433 F. Supp. 2d 460 (M.D. Pa. 2006); and *Weiner v. Pritzker*, 2001 WL 1807929 (Pa. Common Pleas Ct. – Phila. Cnty.).

In making this argument, Defendants rely on "traditional agency theory," *Pritzker*, 7 F.3d at 1121, as in material part they quote in support of their argument the following language from *Pritzker*: "Because a principal is bound under the terms of a valid arbitration agreement, its agents, employees, and representatives are also covered under the terms of such agreements." *Id.* We do not believe that Plaintiffs have alleged that the nonsignatory defendants are agents of Chesapeake Appalachia in connection with the latter's natural-gas operations. However, another portion of *Pritzker* does support Chesapeake Energy's and Nomac's right to arbitrate Plaintiffs' claims against them.[7]

---

[7] Since Chesapeake Energy and Nomac can compel arbitration, we only state why the allegations about Schlumberger do not establish it was Chesapeake Appalachia's agent. One of the elements of agency is the principal's control of the undertaking. *Walton v. Johnson*, 66 A.3d 782, 787 (Pa. Super. Ct. 2013). Plaintiffs' allegations are insufficient to establish that Chesapeake Appalachia controlled Schlumberger.

-14-

In *Pritzker*, the plaintiff trustees of a pension plan had entered into cash management agreements with Merrill Lynch, Pierce, Fenner & Smith, Inc. (MLPF&S). The agreements contained arbitration clauses. 7 F.3d at 1112. Belinda P. Stewart, a financial consultant employed by MLPF&S, advised about, and made, purchases for the plan. *Id.* Merrill Lynch Asset Management, Inc. (MLAM) was the custodian of the assets. *Id.* at 1113. MLAM and MLPF&S were wholly-owned subsidiaries of Merrill Lynch & Co., Inc. *Id.* at 1112. The trustees sued over Stewart's unauthorized purchase of certain assets for the plan. *Id.* at 1112. Defendants moved to compel arbitration. In relevant part, the Third Circuit ruled that the trustees had to arbitrate their claims against Stewart because as an employee of MLPF&S she was an agent of the company and hence bound by the arbitration clause in the agreements "[u]nder traditional agency theory." *Id.* at 1121.

In regard to MLAM, the court of appeals ruled that "analogous reasons" supported arbitration of the claims against it, describing MLAM as the "corporate sister of MLPF&S." *Id.* at 1122. It was significant that MLAM had to perform certain services in connection with the accounts and that it and MLPF&S were subsidiaries of Merrill Lynch & Co., Inc. *Id.* Citing *Isidor Palewonsky Associates, Inc. v. Sharp Properties, Inc.*, 998 F.2d 145 (3d Cir. 1993), the court stated "that arbitration agreements may be upheld against non-parties where the interests of such parties are directly related to, if not congruent with, those of a signatory." *Pritzker*, 7 F.3d at 1122. It then concluded that the claims against MLAM had to go to arbitration because the trustees' "own theory of liability

-15-

demonstrate[d] that MLAM's interests are directly related to, if not predicated upon, MLPF&S' conduct." *Id.* at 1122. The court of appeals summarized as follows: "Where the parties to [a valid arbitration] clause unmistakably intend to arbitrate all controversies which might arise between them, their agreement should be applied to claims against agents or entities related to the signatories." *Id.* at 1122.

*Pritzker* indicates that Chesapeake Energy and Nomac can enforce the arbitration agreement against Plaintiffs. Plaintiffs allege that Chesapeake Appalachia and Nomac are "wholly owned and operated subsidiaries and/or divisions of Defendant Chesapeake Energy." (Compl. ¶ 14).[8] Chesapeake Appalachia, Chesapeake Energy and Nomac are thus related entities.[9] Additionally, since Chesapeake Energy and Nomac are alleged to have engaged in the conduct with Chesapeake Appalachia that damaged Plaintiffs' Property, their interests are directly related to those of Chesapeake Appalachia, the signatory. It follows that Chesapeake Energy and Nomac, as nonsignatories, can enforce the arbitration agreement against the plaintiff signatories.

---

[8] Defendant Schlumberger is alleged to be a Texas corporation. (*Id.* ¶ 22). Plaintiffs do not allege any relationship to the other defendants.

[9] We note that Defendants' "Corporate Disclosures" are consistent with Plaintiffs' allegations except that none of the entities is a division of any other. Defendants affirm that Chesapeake Appalachia is a wholly-owned subsidiary of Chesapeake Energy. Nomac is "ultimately owned by Chesapeake Operating, Inc., a wholly-owned subsidiary" of Chesapeake Energy. (Doc. 25).

-16-

### 2. *Equitable Estoppel*

Since Defendants have not established that Plaintiffs must arbitrate their claims against Schlumberger under an agency theory, we address their argument based on equitable estoppel. Defendants argue that equitable estoppel requires Plaintiffs to arbitrate their claims against them. Nonsignatories to an arbitration agreement can rely on equitable estoppel to compel signatories to arbitrate. *Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324, 333 (E.D. Pa. 2004).[10]

In the instant case, Defendants rely on *Bannett v. Hankin*, 331 F. Supp. 2d 354 (E.D. Pa. 2004). *Bannett* contains the following language concerning estoppel of a signatory:

> [N]onsignatories to an arbitration agreement have standing to compel arbitration against a signatory and the signatory is estopped from avoiding arbitration with a nonsignatory when the issues which the nonsignatory wants to resolve are intertwined with the agreement that the signatory signed. [citations omitted]. This theory applies when a signatory to the written agreement must rely on the terms of the agreement to assert its claims against the nonsignatory such that the signatory's claims make reference to or presume the existence of the written agreement, or the signatory's claims arise out of and relate directly to the written agreement. [citations omitted].

*Id.* at 359-60 (brackets added)(footnote omitted). Defendants argue that this standard is satisfied here because Plaintiffs allege the nonsignatory defendants' conduct was

---

[10] In *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, SAS*, 269 F.3d 187, 201-02 (3d Cir. 2001), the Third Circuit observed that the doctrine existed but did not apply it there because a signatory was attempting to use it to compel a nonsignatory to arbitrate, when the doctrine only applies in the opposite circumstances.

-17-

pursuant to the Lease and that they were acting jointly with Chesapeake Appalachia, a signatory to the Lease. According to Defendants, this makes the issues presented in this case intertwined with the Lease and directly related to the Lease. Thus, Plaintiffs are estopped from not honoring their commitment to arbitrate.

We disagree. A fuller presentation of the standard to be employed can be found in *In re: Humana Inc. Managed Care Litigation*, 285 F.3d 971 (11th Cir. 2002), where the Eleventh Circuit stated that allowing a nonsignatory to compel arbitration under an estoppel theory is based on fairness. *Id.* at 876. More specifically, estoppel applies when the signatory relies on the agreement containing the arbitration clause to establish his claim against the nonsignatory, and then repudiates the agreement when it would require arbitration. *Id.* "The plaintiff's actual dependance on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel." *Id. See also Miron*, *supra*, 342 F. Supp. 2d at 333 (quoting *In re Humana*).

In the instant case, Plaintiffs are not relying on the Lease to establish their claims against the nonsignatory defendants, Chesapeake Energy, Nomac and Schlumberger. Nowhere in their complaint do they allege that a provision of the Lease entitles them to relief against these defendants. Instead, their claims against these defendants are statutory and common-law ones, claims they can assert against the nonsignatories independently of the Lease. Plaintiffs are alleging a claim for breach of the Lease, but only against Chesapeake Appalachia. Since Plaintiffs are not relying on

-18-

the provisions of the Lease to make their claims against the nonsignatory defendants, fairness does not dictate that they be estopped from litigating their claims against them in court and requiring them to go to arbitration instead.

V. *Further Discovery*

At this point, we should order Plaintiffs to arbitrate their clams against defendants, Chesapeake Appalachia, Chesapeake Energy and Nomac while staying judicial proceedings involving Schlumberger. *See Amato*, *supra*, 433 F. Supp. 2d at 492 (granting stay of judicial proceedings against defendants not subject to arbitration)(citing *Berkery v. Cross Country Bank*, 256 F. Supp. 2d 359, 370 (E.D. Pa. 2003)); *Sew Clean Drycleaners & Launders, Inc. v. Dress For Success Cleaners, Inc.,* 903 A.2d 1254, 1258 (Pa. Super. Ct. 2006) (under state law a court action against the party not subject to the arbitration agreement should have been stayed pending the resolution of the arbitration proceedings).

However, *Guidotti* instructs us to allow a period of discovery to determine if Defendants can show that Schlumberger was an agent of Chesapeake Appalachia. *Guidotti*, 716 F.3d at 774. If so, the claims against Schlumberger should also be arbitrated. A period of discovery on whether Chesapeake Energy and Nomac can satisfy a traditional agency status would also be appropriate, as well as discovery on facts that

-19-

would support whether this case involves interstate commerce and hence that the FAA controls arbitrability of the claims.[11]

We will issue an appropriate order.

       /s/ William W. Caldwell
William W. Caldwell
United States District Judge

Date: November 26, 2013

---

[11] Two of my colleagues have ruled that an oil-and-gas lease is not part of interstate commerce. *See Eisenberger v. Chesapeake Appalachia, LLC*, No. 09-CV-1415, 2010 WL 457139, at*2 (M.D. Pa. Feb. 4, 2010)(Caputo, J.); *Ulmer v. Chesapeake Appalachia, LLC*, No. 08-CV-2062 (M.D. Pa. Jan. 16, 2009)(Jones, J.). Other courts disagree. *See Sonda v. Chesapeake Appalachia, LLC*, No. 12-CV-0103, 2012 WL 5471763, at *2 (N.D. W.Va. Nov. 9, 2012); *Heller v. TriEnergy, Inc.*, No. 12-CV-0045, 2012 WL 2740870, at *11 (N.D. W.Va. July 9, 2012); *Alexander v. Chesapeake Appalachia, LLC*, 839 F. Supp. 2d 544, 550 (N.D.N.Y. 2012).